SAM J. SYRACUSE AND ALMA I. SYRACUSE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Syracuse v. Commissioner
Docket No. 14787-79.
United States Tax Court
T.C. Memo 1981-340; 1981 Tax Ct. Memo LEXIS 403; 42 T.C.M. (CCH) 288; T.C.M. (RIA) 81340; June 30, 1981
*403 Held: Petitioners are entitled to a business bad debt deduction under ec. 166(a), I.R.C. 1954, for a debt which became worthless in 1975. Vetus J. Syracuse, for the petitioners. David D. Dahl, for the respondent. EKMAN
MEMORANDUM FINDINGS OF FACT AND OPINION EKMAN, Judge: Respondent determined a deficiency of $ 30,862.03 in petitioner's Federal income tax for the year 1975. After a concession by petitioner, the sole remaining issue is whether a debt which became worthless in 1975 was a "nonbusiness" debt within the meaning of section 166(d). FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, the first supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. Sam J. Syracuse (petitioner) and Alma I. Syracuse, husband and wife, resided in Euclid, Ohio at the time they filed their petition herein. Their Federal income tax return for 1975 was filed with the Office of Internal Revenue Service at Cincinnati, Ohio. Until the end of 1969 petitioner was a member of a partnership, A. R. Syracuse & Sons, engaged in the topsoil, sand, and gravel business. Due to poor economic conditions, petitioner left that business and became involved in landfill operations. On August 27, 1969 and October 28, 1969, petitioner *405 and his wife purchased three parcels of property in Painesville, Ohio specifically for use in his landfill operations. The "Painesville property" contained approximately 21 acres and had a deep excavation, 40 to 50 feet in depth. The property was hidden from public view and had adequate road access, characteristics desirable in the landfill business. Prior to March, 1970 petitioner owned, in addition to the Painesville property, approximately 20 acres in Eastlake, Ohio and Willoughby, Ohio. A portion of the "Eastlake" property was leased to the DeMaltie Brothers who used it in the landfill business [1] they operated pursuant to a permit held by the City of Eastlake. Petitioner's landfill activity on the Eastlake and Willoughby properties included "diking" or building high walls, the purpose of which, inter alia, is to contain refuse so that it can easily be complacted. He also kept equipment used for landfill operations on the Eastlake property. Although he did not have a permit for a landfill, in 1970 such a permit was not difficult to secure and often not necessary. *406 Petitioner felt his prospects were good that the City of Eastlake would use his property for the overflow refuse that could not be accommodated in the DeMaltie Brothers' landfill property, abutting that of petitioner. Petitioner frequently met with public officials in an effort to secure business for his landfill property. He spoke with mayors of various cities and towns in Lake County, the County in which Eastlake, Willoughby, and Painesville are located, and attended numerous meetings. Associates in the landfill business, to whom petitioner was known as engaged only in the landfill business, considered petitioner's properties suitable for a successful landfill. While engaged in his landfill operations, petitioner was also engaged in the sewer construction business as S.S. Construction, Inc. [2] Prior to the incorporation of S.S. Construction, Inc., petitioner owned a backhoe, a front end loader, and a dragline, equipment used in landfill operations. Petitioner purchased the backhoe in February, 1970, and used it in the diking activity for his landfill business although the backhoe is also useful in the sewer construction business. *407 In his efforts to secure landfill business for his properties, petitioner developed a relationship with Solid Waste Sciences, Inc. (hereinafter SWS), a company which was marketing a system of resource recovery from waste. The product reclaimed from the solid waste that would come into the SWS system would eventually be sold as new soil; the residue would either be incinerated or taken to a landfill, depending upon what was recovered and what remained. Charles Crown, a long time acquaintance of petitioner who became a vice president of SWS in April, 1970, was present at numerous meetings with petitioner and was very familiar with the properties owned by petitioner. Those properties were continually discussed by Crown and petitioner and a working map of SWS designated them as possible sites for the landfill if SWS obtained a contract with Lake County for waste treatment. On May 11, 1970, a contract was entered into between SWS and Lake County which provided for SWS to submit a detailed proposal with extensive plans and specifications for a waste disposal system. The properties of petitioner, because of their location and transportation access, were contemplated as the sites *408 to be used in the SWS system although there was no written contract between SWS and petitioner to that effect. [3] Had his properties been used in the SWS system in Lake County petitioner would have been compensated on a per ton basis. Petitioner was also offered an executive position with SWS. The contract of May 11 contained provisions, contingent upon acceptance by the County of the proposal and the implementation of the project, that the County would contract with SWS to operate or supervise operation of the plant for the first 15 years of its operation or perhaps longer. The contract also contained other provisions applicable in the event *409 that the County abandoned the project and determined not to proceed or was unable to proceed with construction of the solid waste disposal facility. Mr. Crown felt that there was never any doubt that the project would go through once the contract of May 11, 1970 had been signed. On June 8, 1970, petitioner loaned $ 11,666.67 to SWS. The loan was used, at least in part, to prepare the voluminous plans and specifications necessary for completion of the contract between SWS and Lake County. At the time petitioner made the loan to SWS, there was no indication that the SWS system would not be constructed or that he would not be repaid in full. Petitioner owned to stock in SWS. The contract of May 11, 1970 was subsequently the subject of a lawsuit between SWS and Lake County and the SWS system was never adopted by Lake County; thus petitioner's properties were not used by SWS. The debt owed petitioner by SWS became worthless during calendar year 1975. [4] On Schedule D of his 1975 return, petitioner listed, under the heading Long-Term Capital Gains and Losses - Assets Held More than 6 Months, "SWS Stock and Note Became Insolvent". *410 OPINION Section 166(a) provides a deduction for debts that become worthless in a taxable year. However, section 166(d) provides that a nonbusiness debt of a noncorporate taxpayer which becomes worthless shall be treated as a short term capital loss. Respondent contends that petitioner's loan of $ 11,666.67 to SWS was a nonbusiness debt; petitioner contends that it was a business debt. A nonbusiness debt is defined in section 166(d)(2) as a debt other than (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. The question whether a debt is a business or nonbusiness debt is a question of fact. , affg. a Memorandum Opinion of this Court, , affd. per curiam . In order for petitioner to be entitled to treat the debt as a business debt, he must show that he was engaged in a trade or business at the time the debt was created. A showing that *411 he was engaged in an income or profit making activity will not satisfy the narrower category of "trade or business". . At the outset we note that the parties have stipulated that the $ 11,666.67 received by SWS from petitioner was in fact a loan and respondent on brief concedes that it was not a contribution to capital. Petitioner contends that at the time the debt was created he was engaged in the landfill trade or business and that the loan was proximately related to that business, while respondent contends that at that time petitioner's landfill activity constituted merely investigation, promotion, and preparation to enter into a trade or business. Alternatively, respondent argues that petitioner's landfill activity was an activity for production of profit or income which did not rise to the level of a trade or business. Neither the Internal Revenue Code nor the regulations contains an explicit definition of the statutory phrase "trade or business". See ; . All relevant factors are *412 to be considered and the question is essentially one of fact. ; see . The statutory phrase "trade or business" presupposes an existing trade or business with which the taxpayer is directly connected. . When a taxpayer investigates a potential new trade or business or prepares to enter such a business, he is not engaged in the trade or business at that time. See , affd. on another issue . Thus, expenses incurred in investigating, promoting or otherwise preparing to enter a trade or business have been held to be nondeductible. See (preliminary expenses also held nondeductible as expenses incurred in the production or collection of income or in the management, conservation, or maintenance of property held for the production of income). After careful examination of the entire record, we are persuaded that petitioner was engaged in the *413 landfill trade or business at the time the debt was created. The Painesville property was purchased specifically for the landfill business. Witnesses testified that this property, which was described as merely "a big hole in the ground", could only be used for landfill. Petitioner attended numerous meetings in an effort to secure business for his landfill. He continuously held himself out to the public authorities and associates as being in the landfill business, and persons in that field associated him only with that landfill business. See (Frankfurter, J., concurring). He owned and operated machines for his business and was diking walls on the Willoughby and Eastlake properties well before June 8, 1970, the date the debt was created. Furthermore, at the time of the loan it appeared that petitioner was about to receive the rewards from his continuing and persistent efforts since SWS had designated his landfill business for its resource recovery project in the Lack County. Respondent, pointing to "trade or business" as used in section 162 and citing the facts of , *414 and , contends that petitioner's activities with respect to the landfill business constituted only preliminary, investigatory, preparatory activities. However, respondent's reliance on Westervelt and Ward is misplaced because they are factually different from the case at bar; the business activity in those cases was far less than the business activity of petitioner in his landfill operations. [5]
*415 Respondent contends in the alternative that even if petitioner's activities constitute more than preparation to enter the landfill business, they were activities engaged in for profit which do not rise to the level of trade or business. Respondent points to the chronological order and the legislative history of sections 162 and 212 in support of his analysis. Although there is a distinction between "trade or business" and an activity for the production of income or profit, see , section 212 was designed to expand the scope of allowable deductions and not intended to preclude the deduction of expenses otherwise allowable under section 162. See , on appeal (9th Cir., Nov. 24, 1980). Although it is true petitioner was engaged in the sewer construction business as S.S. Construction, Inc., during the taxable year 1970, a person may have two trades or businesses, see ; , affg. a Memorandum Opinion of this Court, , *416 and this is even more likely in fields which are so closely related. Respondent also points out that the backhoe is useful in the sewer construction business and the frontend loader useful in the topsoil, sand, and gravel business. However, petitioner purchased the backhoe prior to the incorporation of his sewer construction business, and he retained the frontend loader, as opposed to selling it or allowing it to be retained by A.R. Syracuse & Sons, well after he left the topsoil, sand, and gravel business. Respondent attempts to minimize petitioner's actual landfill activities by contending that those activities were related to the DeMaltie Brothers' landfill. This contention is unsupported by the record. The factors enumerated above which indicate that petitioner was engaged in the landfill business more than adequately establish that petitioner was engaged in that business on his own account and not on behalf of the DeMaltie Brothers. Having made the preliminary determination that petitioner was engaged in the landfill business, we must determine whether the loan to SWS was proximately related to that trade or business. See . *417 In , the Supreme Court stated that: * * * in determining whether a bad debt has a "proximate" relation to the taxpayer's trade or business, as the Regulations specify, and thus qualifies as a business bad debt, the proper measure is that of dominant motivation, and that only significant motivation is not sufficient. * * * Also see , remanded on remand. A debt is a business debt if the dominant motive for its creation or acquisition is to benefit the lender's trade or business. See ; ; ; In the case at bar, petitioner's dominant motive for creating the debt was to benefit his landfill business. Petitioner loaned the funds to SWS so it could prepare the voluminous plans and specifications necessary for completion of its contract with Lake County. Had the *418 SWS resource recovery system been implemented in Lake County, the rewards for petitioner's landfill business, including compensation on a per ton basis, would have been substantial or, in petitioner's own words, "had this gone through, I wouldn't have to worry about money any more". Petitioner had expended much time and effort in attempting to secure business for his landfill and the loan to SWS brought him one step closer to having SWS use his property. Clearly, there is a direct, proximate relation between the debt and petitioner's landfill business and petitioner has sustained his burden of showing that his dominant motive in making the loan was proximately related to this trade or business. Respondent points out that even had the SWS system been implemented, SWS was not contractually bound to use petitioner's landfill. However, it is not necessary that there have been a contractual commitment by SWS in order for us to determine that petitioner's dominant motive was proximately related to the landfill business. Petitioner was well aware that SWS had entered into a contract with Lake County, that SWS was using his funds to prepare the plans and specifications, that this property *419 was considered the prime site for the landfill needs under that contract, and that consequently his landfill business would substantially benefit from completion of the contract. These facts amply support our conclusion as to petitioner's motive. Although petitioner may have been over optimistic, the only reason for the existence of the debt [6] was its direct relation to his landfill business. See . In sum, we find that petitioner was engaged in the landfill trade or business at the time the debt was created, that the dominant motive for creation of the debt was proximately related to that trade or business and that accordingly, petitioner is entitled to deduct the $ 11,666.67 as a business bad debt created or acquired in connection with a trade or business. Due to a concession by petitioner, Decision will be entered under Rule 155. Footnotes
1. The DeMaltie Brothers also owned property adjacent to the property they leased from petitioner.↩
2. S.S. Construction, Inc. was incorporated in March, 1970.↩
3. The SWS system was not the only system considered for Lake County. Petitioner, in an effort to assure landfill business for his properties, also developed a relationship with a company employing a transfer satellite concept system and which was competing with SWS for the Lake County contract. Harry Fedele, an employee of that company, testified that during the period of competition for the Lake County contract his company was most interested in petitioner's properties and considered them suitable for fulfilling its landfill needs.↩
4. The parties have stipulated to this effect.↩
5. In , the taxpayer explained on his return that the expenses incurred were "in primary stages of investigation and examination, and collection of information and data" and were undertaken with the intention of going into the cattle business at a favorable time" and his activities in that business were only minimal at that time; thus his expenses were clearly preparatory in nature. In , affd. , the taxpayer, after being a partner in the Ward Refrigerator & Mfg. Co., expended $ 2,075 in investigating the possibility of entering the business of manufacturing and selling concrete blocks, such expenses being incurred immediately after leaving one business and prior to the incorporation of his new concrete block business. Those expenses were for organization and development in preparation for, and prior to, the incorporation of his new business. In the case at bar, petitioner, as a sole proprietor and not as an officer or stockholder in the landfill business, had expended considerable sums in relation to the amount needed for a landfill business and had taken substantial steps in relation to the total steps needed for that business. He had already made a substantial commitment, and not merely a cursory investigation of a possible commitment, to the landfill business in terms of energy, assets, and money well before the debt was created.↩
6. We have found that petitioner owned no stock in SWS. At trial, counsel for respondent reserved the right to contend that the debt was a contribution to capital rather than a loan but this issue was subsequently conceded by respondent.↩